## JEREMIAH ARNOLD *v.* Estate of SAMUEL ARNOLD.

Any person, who believes in the existence of God or a Supreme Being, who is the just moral Governor of the universe, who will, either in this life or the next, reward virtue and punish vice, and who feels that an oath will be binding upon his conscience, cannot be excluded from giving testimony, on the ground of his religious belief.

Hence a christian of any denomination or sect, a mahommedan, a jew, a pagan, or a deist, is not, on that account, an incompetent witness.

All witnesses are to be sworn in such a way as to bind their consciences.

Atheists, or those who do not believe in the existence of any Supreme moral Governor of the universe, cannot be sworn, nor give testimony, in any judicial tribunal.

Parties, admitted as witnesses in their own cases, by statute, stand on the same foundation, in this respect, as other witnesses.

THIS was an appeal from the decision of commissioners, appointed by the probate court to receive, examine and adjust all claims and demands against the estate of Samuel Arnold, deceased, of which estate David Arnold and Nancy Arnold were administrators.

The plaintiff declared in an action of book account against said estate. Judgment to account was rendered in the county court and auditors were appointed, who reported that the parties appeared before them, and the plaintiff exhibited his account against said estate, and offered to prove the same by his own oath; but, it appearing that the plaintiff did not believe in the existence of a Supreme Being, the auditors decided that his testimony was inadmissible, and he was not permitted to testify. The counsel for the plaintiff then insisted that the plaintiff was a competent witness to testify to

said account under the statute laws of this state, and requested the auditors to administer an oath or affirmation to the plaintiff, agreeably to the second section of chapter 109, of the Revised Statutes. But the auditors decided that such oath or affirmation ought not to be administered.

The auditors then heard other testimony than that of the plaintiff, relating to said account, and found that there was nothing due from said estate to the plaintiff.

The plaintiff excepted to said report, because the auditors refused to permit him to testify to his account.

The county court overruled the exceptions, accepted the report, and rendered a judgment in favor of the estate.

The plaintiff excepted to the decision of the county court.

*John Roberts,* for plaintiff.

The auditors erred in refusing to the plaintiff the privilege of testifying to his account at the audit.

1. Because there is no law, common or statute, which justifies the decision.

2. Because the common law, in regard to witnesses, is not applicable to our situation and circumstances.

3. Because the decision is a violation of the third and fourth articles of the declaration of rights.

4. Because, in our penal code, the disqualification for crimes does not prevent a party from testifying in his own cause.

5. Because disqualifications, in our penal code, do not reach blasphemy.

6. Because the objection should go to the credibility rather than to the competency of the witness.

*D. Kellogg* and *Wm. C. Bradley,* contra.

"Atheists, and such infidels as profess not any religion that can bind their consciences to speak the truth, are excluded from being witnesses." 1 Phillips' Ev. 21, citing Bull. N. P. 292. 1 Atk. 40, 45, 48. Gilb. Ev. 129.

In *Jackson* v. *Gridley,* 18 Johns. R. 103, a person was proved to have, within three months of the trial, often deliberately declared his disbelief in the existence of a GOD, and a future state of rewards and punishments; and the rule adopted in that case was, that all who did not believe in a GOD, or, if they did, disbelieved that he would either reward or

WINDHAM,
*February,*
1841.
―――――――
Arnold
*v.*
Eetate of Ar-
nold.

punish them in the world to come, were incompetent to testify.

In *the People* v. *Matteson,* 2 Cowen, 432, and *Anonymous,* Id. 572, it was held that a belief that GOD would punish, either in this, or a future world, was sufficient, and that a witness so believing might testify.

The same doctrine was held in *Hunscom* v. *Hunscom,* 15 Mass. R. 184.

In Connecticut and Tennessee, belief in accountability after death is required, which excludes Universalists. 7 Conn. R. 66.

Where one witness said he did not believe in GOD, nor a future state, and another declared he did not believe in a future state, that he had read Paine's works, and did not know whether he believed any thing, Story J. rejected them both. 5 Mason's R. 16, 18, 19.

No case can be found where an atheist has been permitted to testify, nor can there be a distinction between a witness offered by a party to the suit and the party himself, who might otherwise testify, under the statute, in this action. The legislature did not intend, by permitting parties to testify in the action of book account, to abolish the common law rule, which rejects atheists.

The opinion of the court was delivered by

REDFIELD, J.—The question which we are now for the first time called to decide, is one of some little delicacy, and of very great importance. It is one of delicacy, because those, who may think themselves affected by it, are liable to feel aggrieved by a determination which excludes them from giving testimony, even in their own cases, and by misapprehending, to some extent, the grounds of the exclusion, might possibly consider it rather a ꞌmatter of punishment, than misfortune, and thus feel disposed to resist the rule, rather than reform either their habits or belief. On the other hand, some very conscientious persons would feel, no doubt, that where the rule was so narrowed down, as to admit Pagans, Jews, Mahometans, Deists, Universalists, and especially members of the Greek and Roman communions, that all religion was desecrated and trodden under foot. Under these circumstances, we feel solicitous that the reasons of

this decision should be understood, in order that the ques-
tion here decided may be put at rest, until the law-making
power shall see fit to change the rule, which, judging from
the past, is not likely soon to occur.

It is hardly necessary here to repeat, for the hundredth
time, the very obvious remark, that in deciding questions up-
on these seats, we have not to inquire what, upon principles
of expediency or propriety, the rule of law should be, but
what *is it ?*

Almost all sober, and especially religious men, have for many
years, in ruminating upon reforms in our system of jurispru-
dence, sincerely regretted the very unnecessary frequency of
oaths ; and not a few men of that same class have even ques-
tioned the necessity of resorting to the sanction of an oath,
in any department of the civil administration. It is doubt-
less true, that there exist very grave reasons in favor of
adopting even the latter opinion ; but such an important step
in simplifying the system of municipal law and government,
and one so untried, could hardly be taken, except upon the
most mature consideration, and the most thorough conviction
of its necessity.

There is but one further general observation upon this sub-
ject, which I deem it my duty to make in this place, before
proceeding to consider the main question involved. What-
ever may be said to the contrary, it is, I think, nevertheless
true, that want of charity and of indulgence towards the
opinions of those who, in religious matters, have adopted
principles of belief at variance with those of the mass of man-
kind, has been the means of driving men into more obstinate
and persevering error upon religious subjects, in our world,
than almost all others. We do not always reflect, how different
*this* from the spirit of the great author of our faith, while up-
on earth. We are too ready to *"forbid those who follow
not with us."* And it is *hereafter* to be known, whether
*sincerity* and *devotion,* even in a false faith, will not be " ac-
counted for *righteousness,"* on the one hand ; while false
*pride* and *bigotry* will only insure the more certain and the
greater condemnation.

In regard to oaths, I think it will be conceded on all hands
that some kind of religious belief has always been considered
indispensable, in order to their binding obligation upon the

Windham,
February,
1841.

Arnold
v.
Estate of Arnold.

conscience of the one sworn. At times, it has been deemed an essential pre-requisite that the person sworn should believe in all the articles of the Christian faith. Such were some of the early English decisions. And Mr. Starkie, in the last edition of his work on evidence, says, "All persons may be *sworn,* who believe in the existence of God, a future state of rewards and punishments, and in the obligation of an oath;" thus clearly indicating that all this is necessary. But as Lord Mansfield, in delivering the opinion of the court in the case of *Atcheson* v. *Everitt,* Cowper, 389, well says,— " Since the case of *Omichund* v. *Barker,* 1 Wilson, 84, (1 Atk. 21. Willes, 550.) and another case of great authority determined since, the nature of an appeal to Heaven, *which ought to be received as a full sanction to evidence,* has been more fully understood." The case of *Omichund* v. *Barker* was that of the depositions of certain Gentoos, sworn according to the ceremonies of their religion, by stooping down and touching the shoes of their priests. The other case referred to by the learned judge above, was that of a Turk, sworn upon the Koran, Strange, 1104. A Jew, too, may be sworn upon the Pentateuch, Vernon, 263, which was the case of an answer in chancery. It is said in the report of the case of *Omichund* v. *Barker,* "that, at this day, it seems to be settled, that infidelity of any kind doth not go to the competency of a witness." This must mean *infidelity,* as contradistinguished from *Christianity ;* for it is well settled that an atheist cannot be sworn.

In support of the proposition, that an atheist cannot be sworn, we need only refer to the history of oaths, and the nature of an oath. An oath is well defined to be " a solemn invocation of the vengeance of the Deity, " if the person sworn do not regard the requisitions of the oath. Hence Heinnecius, the learned commentator upon the civil law, defines an oath thus, *jusjurandum religiosa adserveatio per invocationem Dei,* &c. The case of Jacob and Laban, cited in argument of the case of *Omichund* v. *Barker,* where one swore by the God of Abraham, and the other by the God of Nahor, (Genesis, ch. 31 v. 52, 53.) shows both the necessity of being sworn upon the belief in some God, who will avenge perjury, but also, that each person must swear according to that view of Deity which meets his belief and

binds his conscience. All oaths, spoken of in the scriptures, both of the old and new testaments, are obviously regarded as religious ceremonies. Hebrews, ch. 6, v. 16. " For men verily swear by the *greater*."Eccl. ch.8,v.2. " Keep the King's commandment, and that in *regard* of the oath of *God*." The same is true of all civilized nations. Among the Greeks and Romans an oath was always regarded as a very sacred *religious obligation*. In Rome, the most solemn oath, which was administered to the soldiers, was denominated *sacramentum*. Other oaths were usually denominated *jusjuranda*, but they were all esteemed as imposing a religious, and not a mere civil bond of obligation. In Tacitus' History, Book 4, chap. 59, we have, *ut sacramentum recitaret*, referring to the military oath ; and *juravere pro—imperio Galliorum*, referring to the common oath of allegiance. In the 16th book of the Annals of the same author, 22d chapter, in reference to oaths generally, we have *principio anni vitare Thraseam solenne jusjurandum*, which, according to the latin *solenne*, seems to imply that it was an *annual solemnity* or *religious custom*. The same evidence might be adduced from other authors, both Greek and Roman. Indeed no man could look at the form of an oath, and not feel that it was regarded as a *religious ceremony*. *Deus esl testis*, or *sic me Deus ad juvet*, as God is my witness, or so help me God. How absurd and impious then, to go through with the solemn farce of administering an oath to one who openly avows his utter disbelief in the existence of any Supreme Being! But there is not wanting ample authority upon this point. Although many cases have required much more than a belief in the existence of God, as a Supreme moral Governor of the universe, who was personal in his existence, and retributive in his government, yet, no case can be found which has allowed a witness,to be sworn upon a belief falling short of that. 1 Starkie's Ev. 23, note 36, and cases there cited. *Curtis* v. *Strong*, 4 Day, 55, where much more was required ; *Jackson* v.*Gridly*,18 Johns. R.98, where the same rule is laid down. This is the rule in the case of *Omichund* v. *Barker*, and indeed in all the English cases, which have been most maturely considered. It is obvious that a sincere deist, a mahometan, or a pagan of any name, if he believe in the existence of God, as above defined, may feel the

WINDHAM,
*February*,
1841.

Arnold
*v.*
Estate of Arnold.

WINDHAM,
*February,*
1841.

Arnold
*v.*
Estate of Arnold.

sanction of an oath as *binding upon his conscience,* as the most devout christian.    And all that is now required is, that the oath should bind the conscience of the witness.    Ch. J. Abbott, in the *Queen's case,* 6 Eng. C. L. 112.    The same rule is in effect sanctioned by the case of *Butts* v. *Swartwood,* 2 Cowen, 431.    The very learned opinion of Walworth, while circuit judge, in the case of *The People* v. *Matteson,* reported in the note to the last case, shows very clearly that the rule laid down in the Queen's case is the true rule.    There does not seem any more propriety in requiring the witness to believe in a future state of existence even, much more of punishment in the future life, than in any other, or indeed all the articles of the christian faith.

But where one is offered as a witness who really does not believe in any Supreme Governor of the universe, who takes cognizance of the conduct of men, and who will reward virtue and punish vice, either in this life or in the future world, it is quite impossible he should be sworn.    There is no mode known to this court by which an oath could be made binding upon his conscience.    If the man sincerely believes himself to belong to the very highest order of intelligences, it may be his misfortune, and not his fault, but he could not be sworn *" by the greater."*  If sworn at all, he must be allowed to swear by himself, which is assuming the attributes of the Almighty, and is an impiety of so gross and awful a character as to be shocking to the feelings of all who dwell in a Christian land.    The truth is, such a person is wanting in one of the most essential qualifications of a witness, which could no more be dispensed with or supplied by the court, or by substitution, than we could supply sanity to an insane witness, or maturity to an infant.    So long as the law requires that a witness *shall be sworn,* it is impossible that an atheist should be received to testify.

In this state this rule is not new.    It has, in almost all the circuits, by different members of the present and former courts, been repeatedly recognized in jury trials of the utmost importance.    The legislature, in former years, have been often applied to to change the rule, and have as often declined to interfere.    The history of legislation in this state upon the subject of the offence of blasphemy, will go far to show the sense of the legislature in regard to the importance of

WINDHAM,
February,
1841.

Arnold
v.
Estate of Arnold.

cherishing in the minds of our citizens a belief in the existence of a Supreme Being, and a decent veneration for his providence and government. From the same sources, too, some inference may be fairly made in regard to the change which the public mind has undergone upon this subject, since the government of the state was founded. Our citizens, I trust, are not now less religiously inclined than they were seventy years ago, but they have learned to feel that the *form* of one's creed is less important than the *sincerity* of his devotion.

The earliest statute, which I have been able to find upon the subject of blasphemy, was passed February 1779. The phraseology of the statute, and the extreme penalty affixed, indicate the severity and sincerity of the age. One now almost shudders to reflect how short a period of time intervenes between us and them. That section is in these words,— " That if any person shall blaspheme the name of God, the Father, Son, or Holy Ghost, with direct, express presumption, and high handed blasphemy, or shall curse in the like manner, *such person shall be put to death.*" The next statute passed upon this subject is much in the same terms, except the penalty is *whipping* and *setting in the pillory*. This bears date 1787. The next statute punishing blasphemy is found in the revision of 1797, and is in these words: "If any person shall publicly deny the being and existence of a God, or of the Supreme Being, or shall contumeliously reproach his providence and government, he shall be deemed a disturber of the public peace and tranquility, and a *corruptor* of public *morals* and *manners*," &c. The punishment was by fine and security for good behavior. This statute, so far as regards the definition of the offence and the penalty, is literally re-enacted in the late revision. Hence it is not true, as has been sometimes said, that to require of a witness a belief in the existence of a Supreme Being, was at variance with the whole spirit and tenor of our constitution and laws. I trust, indeed, that the recognition of the existence and providence of the Supreme Being is a principle deep laid in the very foundation of our institutions. " And if there be," in the language of Chief Justice Willes, " any such infidels, who either do not believe in a God, or who do not think he will reward or punish them, either in this world or the next, they

cannot be witnesses, for this plain reason, that an oath cannot possibly be any tie or obligation upon them."

I shall not stop to inquire how far, in this case, the witness being a party and admitted to testify by statute, a different rule should apply from the ordinary case of witnesses who have no interest in the case. It is obvious that the statute was only intended to remove the objection of interest. Hence it is plain, that a party who is made a witness by statute is to become such under the same requisitions and restrictions as any other witness. He must be of sane mind, of sound memory, of suitable age, willing to be sworn, and capable of taking an oath. It would not be pretended, I presume, that a person convicted of any infamous crime would, nevertheless, be a competent witness, in his own action of account and book account.

                                         Judgment affirmed.